**Melody CELKIS for Cory MIXAN, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security,[1] Defendant.**

**No. 96 C 1493.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 9, 1997.

---

1. Kenneth S. Apfel, Commissioner of Social Security, is substituted for his predecessor, Acting Commissioner John J. Callahan. Fed.R.Civ.P. 25(d)(1).

Mary Elizabeth Kopko, Chicago, IL, for Plaintiff.

Charles R. Goldstein, Assistant Regional Counsel, Sherri L. Thorton, Assistant United States Attorney, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

MORTON DENLOW, United States Magistrate Judge.

Plaintiff Melody Celkis ("Plaintiff") brings this action on behalf of her son, Cory Mixan ("Cory"), pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. 423 *et seq.*, and 1381 *et seq.* The Administrative Law Judge ("ALJ") found that Cory did not meet or equal the requirements of any section of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and was not disabled. (Administrative Record ("A.R.") at 18.)

This matter comes before the Court on cross motions for summary judgment. The issues the Court must decide are: (1) which standard to apply to Cory's disability determination; and (2) whether substantial evidence in the record supports the ALJ's finding that Cory did not meet or equal the requirements of any section of the Listing of Impairments. For the reasons set forth below, the Court grants Defendant's motion for summary judgment, denies Plaintiff's motion, and affirms the ALJ's decision.

## I. FACTUAL BACKGROUND

Cory was born on August 6, 1987, and was almost eight years old at the time of the ALJ's decision. (A.R. at 69, 19.) Plaintiff first applied for SSI disability benefits for Cory on March 18, 1994. (A.R. at 69.) Plaintiff alleges that Cory was disabled beginning February 23, 1994, due to attention deficit hyperactivity disorder ("ADHD"). (A.R. at 69, 101.) Cory has never worked. (A.R. at 14.) Plaintiff's application was denied initially, on request for reconsideration, at the hearing, and by the Appeals Council. (A.R. at 72, 78, 14, 4.)

### A. Testimony

Cory and his mother testified at a hearing before ALJ Dennis Greene on July 20, 1995. (A.R. at 33—68.) Cory testified that other children's parents would not allow him to visit in their homes because he acted bad. (A.R. at 45.) He explained that he had been in trouble at school for misbehaving on the bus, arguing and talking back to the teacher, talking out loud in the classroom, and moving around when he was not supposed to. (A.R. at 48–49.) Cory stated that at home he sometimes became angry with his mother, often fought with his brother, that he threw and broke things, and put a hole in the wall. (A.R. at 49–50.) He stated that he took Ritalin, up to three times a day, saw a doctor about once a month or more, and saw a counselor periodically. (A.R. at 45–47.) Cory testified that he had gone to school at Riveredge for two months and described the "feelings room" there as a place where "you can pound on the walls or something like that when you're mad." (A.R. at 47–48.)

Plaintiff, Cory's mother, testified that Cory is the middle child of her five children. (A.R. at 52.) She began having problems with Cory when he was about three years old and day care refused to keep him after a week. (A.R. at 53.) She had Cory's hearing tested and had him evaluated for ADHD. (A.R. at 53–54.) Eventually, school officials suggested that Cory be evaluated by doctors at Loyola University. (A.R. at 54.) Dr. Robertson at Loyola started Cory on Ritalin. (A.R. at 55.) The Ritalin helped but was not completely successful. *Id.* The doctors also tried prescribing another drug for Cory but he was allergic to that medication. *Id.* Plaintiff stated that Cory had to go to Riveredge because he was misbehaving at school: screaming out, jumping around, and pinching people. *Id.* Plaintiff discussed the problems she had with Cory at home: throwing objects, breaking windows and other objects, spray painting the house, putting holes in the wall, and fighting with his brother. (A.R. at 56–58.) Plaintiff testified that she will not allow Cory to participate on any athletic team activities because she is afraid he will not be able to control himself and will hurt someone. (A.R. at 58, 65.) She must watch Cory all the time because of such behavior as running out into the street without looking. (A.R. at 60–61.) Cory had been in special education classes and his school, Sunnyside, is a special school. (A.R. at 62.)

### B. Medical Evidence

In July 1993, when Cory was five years old, he underwent psychological testing at

Alexian Brothers Medical Center Attention Deficit Disorder Clinic. (A.R. at 129.) John Noto, Ph.D., ("Dr. Noto") was the clinical psychologist. He concluded that Cory demonstrated "no attention or concentration difficulties and does not present as hyperactive." (A.R. at 133.) Dr. Noto found that Cory had depressive features and was developing antisocial behaviors. (A.R. at 134.) Dr. Noto diagnosed Oppositional Defiant Disorder and Depressive Disorder and recommended therapy. (A.R. at 134.)

Cory was first evaluated by Raymond E. Robertson, M.D., ("Dr. Robertson"), Director, Child and Adolescent Program, Department of Psychiatry, Stritch School of Medicine, Loyola University, on February 23, 1994. (A.R. at 142–47.) Dr. Robertson diagnosed ADHD and started Cory on 5 milligrams of Ritalin twice a day. (A.R. at 147, 142.) After Plaintiff reported significant improvement and no side effects, Dr. Robertson increased Cory's dosage to 10 milligrams twice a day on March 9, 1994. (A.R. at 142, 140.) Dr. Robertson reported on May 26, 1994, that since March 30, 1994, Cory had been taking 15 milligrams of Ritalin three times a day with "no side effects and significant benefits as reported by Cory and his mother as well as school staff." (A.R. at 141.)

On June 21, 1994, a reviewing psychologist, Helen Appleton, Ph.D., ("Dr. Appleton") filled out an Individualized Functional Assessment ("IFA") and Case Summary on Cory. (A.R. at 125–28.) Dr. Appleton based her review on the record as it existed at that date. (A.R. at 128.) Dr. Appleton indicated that Cory had less than moderate impairment in cognitive, social, and communicative development, and in concentration, persistence and pace; and moderate impairment in personal/behavioral development and function. (A.R. at 125–26.) Dr. Appleton concluded that Cory's impairment did not substantially reduce his ability to grow, develop, and attain age-appropriate milestones and to engage in age-appropriate daily activities and that Cory was not functionally disabled. (A.R. at 128 .)

**2.** Global Assessment of Functioning.

**3.** The Court has been unable to ascertain from the record what CHPPS stands for; however,

On September 9, 1994, Dr. Robertson reported that Cory was being seen once a month to monitor his response to medication and that up to that time, Cory had suffered no side effects from the medication and had received positive benefits. (A.R. at 137.) Dr. Robertson added that Cory was "asymptomatic with medication, and his performance academically in school has improved one to two levels." *Id.*

Despite being on medication, Cory was admitted to Riveredge Hospital on February 20, 1995, due to behavioral problems at school and on the school bus. (A.R. at 162.) Dr. Robertson was the attending psychiatrist, and Dr. Manjari Kumar was the psychiatry resident. (A.R. at 166.) In the Intake Assessment/Psychiatric Evaluation and Treatment Plan, the DSM-III-R Symptom inventory was filled out as follows:

| | |
|---|---|
| Restlessness | Severe |
| Distractibility | Moderate to severe |
| Inattentiveness | Moderate to severe |
| Hypertalkativeness | Moderate |
| Hyperactivity | Severe |
| Hypertalkativeness | Moderate to severe |
| Psychomotor agitation | Moderate. |

(A.R. at 163.) The provisional diagnoses were:

| | |
|---|---|
| Axis I | Attention Deficit Hyperactivity Disorder |
| Axis II | Deferred |
| Axis III | None at present |
| Axis IV | Severe |
| Axis V | GAF [2] 51 to 60 current |
| | GAF 70 to 80 in the last year |

(A.R. at 166.) Indications for admission to the CHPPS [3] program were as follows:

Marked regression, intensification of significant symptoms, and/or continued failure to respond to appropriate treatment in an outpatient or other alternative setting that presents a significant impediment of this person's ability to perform the requirements of daily living.

Treatment cannot occur unless in an acute hospital with continuous skilled observation and monitoring.

Cory was admitted to the CHPPS program at Riveredge. (A.R. at 214.)

Less restrictive and/or intensive modes of therapy have failed to control symptoms or control the course of illness. (A.R. at 163.)

Ritalin was discontinued due to decreased effectiveness, and Cory was started on Cylert. (A.R. at 163.) The initial treatment modalities were: to continue with the Cylert medication and adjust the dosage; individual therapy; group psychotherapy; milieu therapy; school at Riveredge; and regular family therapy with the mother. (A.R. at 166.)

Cory was discharged from Riveredge on April 20, 1995, (A.R. at 214), before the ALJ issued his decision on July 28. However, the records involving Cory's discharge were not part of the record upon which the ALJ based his decision. The discharge records were part of the record at the time the Appeals Council considered Cory's request for review. (A.R. at 5, 214.)

Upon discharge, Dr. Robertson's final diagnoses were:

| Axis I | Attention Deficit Hyperactivity Disorder |
| Axis II | No diagnosis |
| Axis III | No diagnosis |
| Axis IV | Moderate |
| Axis V | GAF: 50 on admission; 80 on discharge. |

(A.R. at 215.) Cory was again being treated with Ritalin when he was discharged. (A.R. at 215.) Dr. Robertson stated that Cory showed marked improvement in his hyperactivity, and his problems had improved as follows:

| | |
|---|---|
| fighting and negative behavior | 90% |
| not listening | 85% |
| demanding | 70% |
| "hyper" with siblings | 60% |
| conflict with brother, Eric, | 55% |
| not taking no for an answer | 65% |
| hyperactivity | 75% |
| testing limits | 80% |
| short attention span | 85% |
| impulsivity | 80% |

(A.R. at 214.) Dr. Robertson stated that Cory was "not suicidal or homicidal and was able to perform the activities of daily living." (A.R. at 215.) Cory was to return to local school after discharge.

### C. School Records

An undated school activities questionnaire, filled out at Riley School, when Cory's grade level was "1st Grade—Cross Categorical Performing at Grade Level, K–1 Grade Special Education Class," indicated problems with: attention span, concentration, and on-task behavior in class; and inappropriate behavior, including Cory's problems with authority, engaging in power struggles, and touching a teacher's aid inappropriately. (A.R. at 107.)

A summary of behavior problems filled out on November 4, 1993, indicated that for most of the school day Cory was disruptive and had a poor attention span. (A.R. at 90.) He also demonstrated physically aggressive, manipulative, and negative-attention-getting behavior most of the school day and was confrontational with authority figures. *Id.* Cory was referred for a case study evaluation on November 16, 1993. (A.R. at 84.)

A letter dated September 22, 1994, informed Cory's mother that he would be placed in the Social Emotional Class at Sunnyside School. (A.R. at 153–54.) Cory's home school was Riley. (A.R. at 154.)

In October 1994, Cory's teacher filled out five Disciplinary Office Referral reports for Cory's failure to do his homework. (A.R. at 190–91.) The driver of Cory's school bus filled out two disciplinary incident reports for Cory's misbehavior on November 21, 1994, and January 20, 1995. (A.R. at 186, 189.)

On April 28, 1995, Cory's mother was informed that he continued to be eligible for special education and related services, that he would complete the 1994–95 school year at Sunnyside, and that he would be placed in Social Emotional Development at Riley beginning August 1995. (A.R. at 182.)

An undated school report in Exhibit 22 indicates that Cory had been mainstreamed full time. (A.R. at 176.) Another undated report in Exhibit 22 indicates that Cory's daily living skills were age-appropriate and his social/emotional performance had been maintained well enough to continue with full time mainstreaming; although this record is undated, it indicates an implementation period of May 10, 1995, through April 1996. (A.R. at 177.)

### II. THE ALJ'S DECISION

The ALJ discussed the evidence from the Alexian Brothers Medical Center and noted that therapy for Cory was recommended. (A.R. at 15.) The ALJ devoted a paragraph to Dr. Robertson's February 1994 evaluation,

noting that Cory "scored in the moderate to severe range for attention deficit/hyperactivity," that ADHD was diagnosed, and that Ritalin was prescribed. (A.R. at 15.) The ALJ stated that the medical evidence clearly established that Cory had ADHD with marked inattention, impulsiveness, and hyperactivity, but found that these characteristics were attenuated by medication. (A.R. at 15.) The ALJ referred to Dr. Robertson's statement in September 1994 that Cory was asymptomatic with medication. (A.R. at 16.) The ALJ very briefly referred to Cory's "regression" in February 1995, but did not discuss Dr. Robertson's evaluation made upon Cory's admittance to Riveredge. (A.R. at 16.) The ALJ dismissed this latest available report by the treating psychiatrist by stating that there was no indication of continuing regression and noting that school records in Exhibit 22 indicated that Cory was successfully mainstreamed into all classes and would no longer require special education placement in the upcoming school year. (A.R. at 16.) The ALJ discussed and agreed with the assessment and conclusions of the reviewing psychologist, Dr. Appleton. The ALJ indicated that the testimony by Cory and his mother was not especially persuasive or credible. (A.R. at 17.)

The ALJ determined that although Cory's impairment was severe, it did not meet, equal, or functionally equal any Listing. (A.R. at 18.) The ALJ found that Cory had no limitations in cognitive, communicative, or motor functioning, but did have moderate limitations in personal/behavioral functioning and less than moderate limitations in social functioning and concentration, persistence, and pace. (A.R. at 18.) The ALJ found that Cory's impairment did not preclude him from functioning independently, effectively, and appropriately in age-appropriate activities. (A.R. at 18.) Because the ALJ found that Cory's impairments were not of comparable severity to that which would disable an adult, (see 20 C.F.R. § 416.924(a)(1995)), he concluded that Cory was not disabled. (A.R. at 18.)

### III. THE APPEALS COUNCIL DECISION

Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council. (A.R. at 4.) The Appeals Council stated that it considered the written contentions raised by counsel and additional evidence consisting of Riveredge School reports dated February 1995 through April 1996 and Riveredge Hospital reports dated April through September 1995, but concluded that neither the contentions nor the additional evidence provided a basis for changing the ALJ's decision. The Appeals Council stated that the ALJ considered all the evidence in the record as it existed when the ALJ ruled. The Appeals Council noted that the ALJ ruled only on whether Cory was disabled as of July 28, 1995, and the additional evidence after that date was not material to that decision. The Appeals Council remarked that Cory's April 1995 discharge reports from Riveredge, that were not before the ALJ, indicated that Cory showed improvement and that his Global Assessment of Functioning ("GAF") was 80, reflecting only slight symptomology.

### IV. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate the absence of a genuine issue of material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is no genuine issue of material fact in the present administrative review before the Court; thus, summary judgment is appropriate.

### V. JUDICIAL REVIEW OF THE COMMISSIONER'S DECISION

Judicial review of the Commissioner's final decision is governed by 42 U.S.C. § 405(g) which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." An ALJ's decision becomes the Commissioner's final decision if the Appeals Council denies a request for review. 20 C.F.R. § 404.981; *Herron v. Shalala,* 19 F.3d 329, 332 (7th Cir.1994). When the Appeals Council denies a request to review a case, the decision reviewed by the

district court is the decision of the ALJ. *Eads v. Secretary of the Dept. of Health and Human Servs.,* 983 F.2d 815, 817 (7th Cir. 1993). The district court is not free to consider evidence submitted for the first time to the Appeals Council. *Id.* The correctness of the ALJ's decision rests on the evidence that was part of the record as it existed when that decision was made. *Id.*

A reviewing court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron,* 19 F.3d at 329. The ALJ has the duty to resolve material conflicts and make independent findings of fact. *Richardson v. Perales,* 402 U.S. 389, 399–400, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence in the record to support the findings. 42 U.S.C. § 405(g); *Stevenson v. Chater,* 105 F.3d 1151, 1153 (7th Cir.1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales,* 402 U.S. at 401, 91 S.Ct. at 1427 (internal quotations omitted). The ALJ's decision must be affirmed if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support the claimant's argument. 42 U.S.C. § 405(g); *see Pope v. Shalala,* 998 F.2d 473, 480 (7th Cir.1993). The court may reverse the Commissioner's decision only if the evidence "compels" reversal, not merely because the evidence supports a contrary decision. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992). Finally, a credibility determination made by the ALJ will not be disturbed unless it is patently wrong. *Brewer v. Chater,* 103 F.3d 1384, 1392 (7th Cir.1997).

In the present case, the ALJ decision stands as the Commissioner's final decision because the Appeals Council denied Plaintiff's request for review. Medical evidence and school records that were not before the ALJ were submitted to the Commissioner for consideration of Plaintiff's request for review.

Plaintiff directs this Court several times to evidence that was not before the ALJ when he made his decision on July 28, 1995. *See e.g.,* Pl.'s Statement of Material Facts ¶ 15; Pl.'s Mem. in Supp. of Summ. J. at 6, 7; Pl.'s Reply Brief at 1. This Court cannot consider such evidence and will confine its review to the evidence that was before the ALJ.[4] *See Eads,* 983 F.2d at 817.

## VI. CHILD DISABILITY STANDARD

### A. The Standard in Effect At the Time of the ALJ's Decision

Under the Social Security Act at the time the ALJ made his decision, a person was disabled if that individual was

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months (or, in the case of an individual under the age of 18, if he [or she] suffers from any medically determinable physical or mental impairment of comparable severity).

42 U.S.C. § 1382c(a)(3)(A)(1994). Under the regulations at that time, a child was found to have an impairment of comparable severity if her physical or mental impairment so limited her ability to function independently, appropriately, and effectively in an age-appropriate manner that her impairment and the limitations resulting from it were comparable to those which would disable an adult. 20 C.F.R. § 416.924(a)(1995). The child's impairment had to substantially reduce her ability to:

> (1) Grow, develop, or mature physically, mentally, or emotionally and, thus, to attain developmental milestones (*see* § 416.924b(b)(2)) at an age-appropriate rate; or
>
> (2) Grow, develop, or mature physically, mentally, or emotionally and, thus, to engage in age-appropriate activities of daily living (*see* § 416.924b(b)(3)) in self-care,

---

4. The district court has limited review of newly submitted evidence where a claimant argues that the Appeals Council's refusal to review the ALJ's

decision is based on a mistake of law. *Diaz v. Chater,* 55 F.3d 300, 305 n. 1 (7th Cir.1995). Plaintiff does not make this argument.

play and recreation, school and academics, community activities, vocational settings, peer relationships, or family life; or

(3) Acquire the skills needed to assume roles reasonably expected of adults (*see* § 416.924b(b)(4)).

20 C.F.R. § 416.924(a)(1995).

For a child disability determination, an ALJ followed the four-step process outlined in 20 C.F.R. § 416.924(a).

Step (1): Does the child engage in substantial gainful activity? If so, the child is not disabled, and the analysis ends. If not, then the analysis proceeds to the next step.

Step (2): Does the child have a severe impairment, that is, an impairment or combination of impairments that significantly limits her ability to function independently, appropriately, and effectively in an age-appropriate manner? If not, then the child is not disabled and the analysis ends. If so, then the analysis proceeds.

Step (3): Do the child's impairments meet or equal a listed impairment? If they do, the child is disabled. If they do not, the analysis proceeds to the fourth step.

Step (4): Is the child's "individualized functional assessment," considering the impact of the child's impairments on his overall ability to function independently, appropriately, and effectively in an age-appropriate manner, such that the child's impairments are of comparable severity to an impairment or impairments that would disable an adult? If so, the child is disabled. If not, the child is not disabled.

## B. The New Standard

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 redefined the standard for determining whether a child is disabled. The new standard provides that:

An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i)(1997).

Under the new regulations, a child is disabled only if he is not engaged in substantial gainful activity and has a severe impairment that meets, medically equals, or functionally equals in severity any impairment that is in the Listings and meets the duration requirement. 20 C.F.R. § 416.924(a)(1997). That is, the new law eliminates step four in the sequential analysis.

The new evaluation criteria applies to claims not finally adjudicated on or before August 22, 1996. 42 U.S.C. § 1382c note (1996)(Effective Dates). A claim is not fully adjudicated if it was denied in whole and a judicial review is pending on or after August 22, 1996. *Id.; see also* SSA Emergency Teletype No. EM–96–131 § I.D. The complaint in this case was filed on March 14, 1996; thus, the new standard applies to the instant case. *See Brown v. Callahan,* 120 F.3d 1133, 1135 (10th Cir.1997).

The ALJ's findings regarding step four are no longer dispositive because the new standard eliminates the fourth step of the analysis. This Court will review only the ALJ's findings pertaining to the first three steps.[5] Because the ALJ found that Cory had not engaged in substantial gainful activity and that Cory's impairment was severe, the question that this Court must decide is whether the ALJ's finding that Cory's impairment did not meet or equal any listing is supported by substantial evidence in the record.[6]

---

5. At least one district court has remanded the case to the Commissioner for consideration under the new legal standard where it found the new standard to apply. *See Strawder v. Chater,* 955 F.Supp. 91, 93 (E.D.Mo.1997). However, because the first three steps in the analysis are the same, the Court will not immediately remand but will review the still relevant analysis of the ALJ finding that Cory did not meet or equal any

listing requirements. *See Brown v. Callahan,* 120 F.3d at 1135; *Hart v. Chater,* 963 F.Supp. 835, 837–40 (W.D.Mo.1997).

6. Plaintiff does not argue otherwise. Plaintiff concedes that under the current standard, Cory must meet or equal a listing to be found disabled. Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 4.

## VII. THE ALJ'S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD

Plaintiff argues that Cory did meet or equal the requirements of Listing 112.11. The criteria for this listing is as follows:

112.11. Attention Deficit Hyperactivity Disorder:

Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

   A.   Medically documented findings of all three of the following:

   1.   Marked inattention; and

   2.   Marked impulsiveness; and

   3.   Marked hyperactivity;

AND

   B.... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11 (1995).

The appropriate age-group criteria for Cory are:

B.2.   For children (age 3 to attainment of age 18), ... at least two of the following:

   a.   Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

   b.   Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

   c.   Marked impairment in age-appropriate personal/behavioral functioning, as evidenced by:

   (1) Marked restriction of age-appropriate activities of daily living, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

   (2) Persistent maladaptive behaviors destructive to self, others, animals, or property, requiring protective intervention; or

   d.   Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02, ¶ B.2 (1995).

### A.   Part A

■ The ALJ stated that the medical evidence established that Cory had marked inattention, impulsiveness, and hyperactivity; however, the ALJ added that these symptoms were attenuated by medication. (A.R. at 15.) In assessing Part B of the requirements, the ALJ stated that Cory's deficiencies in concentration had been attenuated by medication and that he had progressed sufficiently to be mainstreamed. (A.R. at 16–17.) In determining whether Cory's impairment was of comparable severity, step-four analysis, the ALJ found that Cory had less than moderate limitations in concentration. (A.R. at 18.) Although step-four analysis is not relevant under the new standard, the criteria for step-four analysis are similar to those used to determine whether Cory meets Listing 112.11; thus, the ALJ's discussion and finding here is helpful. *See Hart*, 963 F.Supp. at 840 ("Although under the new law individualized assessments are no longer used to determine whether a child meets the SSI disability requirements, an assessment of functioning in various areas may still be used to determine if a child meets the listing criteria for mental impairments at step three

of the sequential analysis.") The Court concludes that the ALJ found that Cory did not meet Part A of Listing 112.11. The Court finds that there was substantial evidence in the record to support the finding that while Cory was on medication he did not have marked inattention, impulsiveness, and hyperactivity.

Plaintiff argues that in finding that Cory's marked inattentiveness, impulsiveness, and hyperactivity were attenuated by medication, the ALJ relied solely on a nonexamining expert's report and ignored a November 1993 report from Cory's treating doctor and the February 20, 1995, psychiatric examination from Dr. Robertson. The Court is unable to locate in the record a doctor's report from November 1993; however, any such evidence would have been more than a year and a half old when the ALJ made his decision and would have been before Cory was treated with Ritalin. Although the ALJ did not give Dr. Robertson's February 20, 1995, evaluation adequate treatment, he did not ignore the fact that Cory suffered a regression in February 1995. (A.R. at 16.) Contrary to plaintiff's assertion that the ALJ relied solely upon a nonexamining expert in this part of the analysis, the ALJ relied upon school reports to find that Cory's limitations were attenuated with medication. *Id.* The ALJ relied upon the reviewing psychologist's assessment only in making his step-four analysis. (A.R. at 17.) Although the Court is troubled that the ALJ relied upon a nonexamining psychologist's report that was over a year old where the record contained more recent reports from Cory's treating psychiatrist, the new standard makes this part of the ALJ's analysis moot.[7]

Plaintiff also argues that the ALJ failed to fully develop the record before deciding that Cory did not meet Part A of Listing 112.11. Plaintiff asserts that under *Kotsilieris v. Shalala,* 858 F.Supp. 108 (N.D.Ill.1994), the ALJ should have ordered a consultative examination. In *Kotsilieris,* the court ordered

a consultative examination to focus on the scope and severity of the claimant's mental impairment because other evidence in the record suggested that the single existing medical opinion on the severity of the claimant's impairment might not be accurate. *Id.* at 113–14.

Regulations governing consultative examinations provide that the Commissioner may order consultative examinations "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim." 20 C.F.R. § 416.919a(b). Another situation, among others, that will normally require a consultative examination is where "a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and [the Commissioner is] unable to do so by recontacting [the claimant's] medical source." *Id.* The courts generally respect the judgment of the Commissioner regarding how much evidence is necessary to decide the claim. *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir.1994). In the present case, the medical evaluations changed as Cory's condition and treatment changed, but did not conflict, and the Court finds that the ALJ had sufficient evidence in the record to decide the claim.

Because the Court finds that there is substantial evidence in the record to support the ALJ's finding that Cory's impairments did not meet Part A and thus did not meet Listing 112.11, the Court grants the Commissioner's motion for summary judgment. However, for the benefit of a reviewing court, this Court will proceed to review the ALJ's finding that Cory did not meet part B of the Listing.

## B. Part B

In analyzing Part B, where a claimant must meet at least two of the age-appropriate criteria, the ALJ found that Cory had no limitations in cognitive/communicative func-

---

7. Plaintiff is correct that generally evidence from a treating physician is given more weight than nontreating and nonexamining experts if it is well supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2). The Court finds that in this case the evidence from the treating psychiatrist, Dr. Robertson, was well supported and not in-

consistent with other substantial evidence in the record and thus is entitled greater weight than the opinions of the reviewing psychologist, Dr. Appleton. However, in this case, the most recent evidence of Cory's improvement under medication was found in school records and provided support for the ALJ's decision.

tioning because the evidence showed that he has at least average intelligence, was functioning at grade level academically, and could generally make himself understood. (A.R. at 18.) The Court finds that there is substantial evidence in the record to support such a finding.

The ALJ found that Cory had less than moderate limitations in social functioning and moderate limitations in personal/behavioral functioning. (A.R. at 18.) Although the ALJ recognized that Cory has a history of aggressive and impulsive behavior and difficulty relating to authority figures, the ALJ did not find that these problems constituted marked impairments because Cory's school records in Exhibit 22 showed improvement in these areas and the evidence did not show significant problems relating to peers. (A.R. at 16.)

Plaintiff argues that the evidence did show that Cory had a marked impairment in age-appropriate social functioning.[8] However, most of the evidence to which Plaintiff points this Court was either not before the ALJ or pertains to Cory's behavior in 1993, before he was started on Ritalin. (Pl.'s Mem. in Supp. of Summ. J. at 7.) Cory's behavior just prior to his February 1995 admittance to Riveredge is significant. Although the ALJ did not discuss this evidence and the medical evidence from Cory's hospitalization in great detail, he did recognize Cory's regression. The ALJ relied upon school records reporting that Cory was expected to be mainstreamed full time for the upcoming school year to conclude that Cory had recovered from his regression. This Court finds that there is substantial evidence in the record to support the conclusion that after treatment and regulation of medication at Riveredge, Cory's behavior had improved since his February 1995 problems to the extent that his impairments were not marked.

The ALJ stated that Cory did not demonstrate "persistent serious maladaptive behaviors which are destructive to self, others,

animals, or property" because he engages in age-appropriate activities, plays with siblings and friends, and attends school. (A.R. act 16.) The Court finds that this conclusion is supported by substantial evidence in the record of Cory's improvements at school.

The ALJ found that Cory had less than moderate limitations in concentration, persistence, and pace. (A.R. at 18.) Because the regulation requires only a showing of deficiencies in concentration, persistence, or pace, the Court concludes that the ALJ found that Cory met this requirement of Part B. This Court finds that there is substantial evidence in the record to determine that Cory had deficiencies in concentration, persistence, or pace.

Even had this Court held that there was not substantial evidence in the record to support the ALJ's finding that Cory's impairments did not meet Part A of Listing 112.11, the Court finds that there was substantial evidence in the record to find that Cory did not meet two of the requirements in Part B.[9]

## VIII. CONCLUSION

For the foregoing reasons, **Defendant's motion for summary judgment is GRANTED, Plaintiff's motion is DENIED and the decision of the ALJ dated July 28, 1995, is affirmed.**

---

8. Plaintiff did not argue that Cory had marked impairments in personal functioning.

9. Furthermore, although the Court is not free to consider the evidence that was not before the ALJ, the Court notes that Cory's Riveredge discharge records from treating psychiatrist Dr.

Robertson indicate that Cory was able to perform activities of daily living and, as the Appeals Council stated, had a GAF of 80. (A.R. at 215.) If this case were remanded, the ALJ would be free to consider this evidence that would lend more support to his initial decision.